UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL K. OWUSU,
a.k.a., Nathaniel Porter,

    Plaintiff,     CIVIL ACTION NO. 16-cv-12490

    v.       DISTRICT JUDGE JUDITH E. LEVY

MICHIGAN DEPARTMENT OF  MAGISTRATE JUDGE MONA K. MAJZOUB
CORRECTIONS PAIN
MANAGEMENT COMMITTEE, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

  Plaintiff Nathaniel K. Owusu, a state inmate in the custody of the Michigan Department of Corrections (MDOC), proceeding *pro se*, filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983 on June 27, 2016,[1] against Defendants Michigan Department of Corrections Pain Management Committee (PMC), Corizon Health, Inc., Gary R. Kerstein, William C. Borgerding, Keith Papendick, M.D., Craig Hutchinson, M.D., Timothy Kangas, Teri Byrne, Corey Grahn, N.P., Bryan D. Buller, M.D., Teresa Merling, Michael A. Millette, Susan N. Wilson, N.P., Danielle M. Paquette, P.A., Michael Brown, Heather Haapala, Oliver L. Johnston, and Connie D. Lester, alleging violations of his First, Eighth, and Fourteenth Amendment rights.  (Docket no. 1.) Generally, Plaintiff alleges that while he was incarcerated at the Michigan Reformatory (RMI) in

_____

[1] Plaintiff's Complaint was received by the court on June 30, 2016, but under the "prison mailbox rule" promulgated by *Houston v. Lack*, 487 U.S. 266, 270 (1988), and extended to civil complaints filed by incarcerated *pro se* petitioners by the Sixth Circuit in *Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002), Plaintiff's Complaint is deemed filed on June 27, 2016 – the date that it was turned over to prison officials for transmittal to the court.  (*See* docket no. 1 at 1, docket no. 1-1 at 56-57, docket no. 5.)

Ionia, Michigan, the Chippewa Correctional Facility (URF) in Kincheloe, Michigan, and the Lakeland Correctional Facility (LCF) in Coldwater, Michigan from 2011 to 2016, Defendants denied him adequate medical treatment for his pain and liver disease.  (*See id*.)

This matter currently comes before the court on a Motion for Summary Judgment filed by Defendants Corizon, Wilson, Papendick, Buller, Grahn, Paquette, Millette, Hutchinson, and Johnston (hereinafter referred to as "the Corizon Defendants") and a Motion for Summary Judgment filed by Defendants PMC, Kerstein, Borgerding, Byrne, Merling, and Brown (hereinafter referred to as "the MDOC Defendants").  (Docket nos. 155, 185.)  Plaintiff filed Responses to both Motions for Summary Judgment (docket nos. 172, 189), and the Corizon Defendants filed a reply brief in support of their Motion (docket no. 173).  This action has been referred to the undersigned for all pretrial purposes.  (Docket no. 8.)  The undersigned has reviewed the pleadings, dispenses with oral argument on the Motions pursuant to Eastern District of Michigan Local Rule 7.1(f) and issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.   RECOMMENDATION

For the reasons that follow, it is recommended that the Corizon Defendants' Motion for Summary Judgment (docket no. 155) be **GRANTED IN PART** and **DENIED IN PART**, the MDOC Defendants' Motion for Summary Judgment (docket no. 185) be **GRANTED**, and this matter be dismissed in its entirety.

## II.   REPORT

### A.   Background

Plaintiff's 170-page, 855-paragraph Complaint consists of thirteen claims against eighteen defendants, the titles of which are reproduced below:

Claim I:  "Grossly Inadequate Treatment Resulting in Deliberate and Unnecessary Severe Pain and Disability," against Defendants Buller and Grahn;

Claim II:  "Interference With and/or Denial of Treatment for Serious Medical Conditions, Wanton Infliction of Pain and Suffering," against Defendant Byrne;

Claim III:  "Delay and Denial of/Interference with Prescribed Treatment," against Defendants Millette, Brown, Wilson, and Paquette;

Claim IV:  "Complete Denial of Standard Treatment for Serious Musculoskeletal Disease, Including Diagnostic Tests/Specialist Consults, Forced Pain and Suffering by Persistent Denial of Adequate Pain Management, Denial of Emergency Medical Treatment," against Defendants Paquette, Kerstein, Borgerding, Papendick, and PMC;

Claim V:  "Delay and Complete Denial of Treatment for Serious Medical Needs," against Defendants Paquette, Merling, Johnston, Kerstein, and PMC;

Claim VI:  "Complete Denial of Treatment by PMC for Long-Term, Highly-Elevated Alkaline Phosphatase Enzyme Level Resulting in Deliberate and Wanton Infliction of Pain, and Delay and Complete Denial of Treatment for Liver Disease Resulting in Development of Stage IV Cirrhosis, an End-Stage Disease," against Defendants Buller, Millette, Hutchinson, Kerstein, Wilson, and PMC;

Claim VII:  "Defendant Corizon's Policy, Practice, and Custom of Deliberate Indifference Resulting in the Systematic and Wanton Infliction of Pain on Plaintiff, the Delay/Denial of Treatment, Resulting in Plaintiff's Suffering, Disability, and Partial Paralysis," against Defendants PMC and Corizon;

Claim VIII:  "Plaintiff was Retaliated Against for the Exercise of His First Amendment Right to the Use and Recognition of His Legal Name in His Electronic Medical Records," against Defendant Kangas;

Claim IX:  "Defendants BHCS-PMC and Corizon, Through Its Providers, Conspired With Indifference to Inflict Pain and Suffering on Plaintiff Through the Denial of Adequate Pain Management and Proper Diagnostic Tests, Resulting in Plaintiff's Permanent Disability and Partial Paralysis, to Inflict Plaintiff With Liver Toxicity Leading to Hepatitis and Cirrhosis Where the Defendants Limited Plaintiff to Only Off-Label, Hepatotoxic Medications for Pain, and to Hasten Plaintiff's Ultimate Death by Stage IV Cirrhosis Which Defendant Hutchinson Allowed to Develop Without a Biopsy or Preventative Treatment," against Defendants PMC, Corizon, Hutchinson, Buller, Grahn, Millette, Paquette, Johnston, and Kerstein;

Claim X:  "The MDOC's Use of Prisoners' PSIRs in Medical Records, With Which to Make Medical Judgments and Decisions Denying Plaintiff's Right to Adequate Health Care, Violates the Eighth and Fourteenth Amendments to the U.S. Constitution, as well as State Disclosure Laws Protecting the Confidentiality of PSIRs, and the Michigan Administrative Procedures Act (MAPA)," against Defendant PMC;

Claim XI:  "The Defendants Herein Named, Being State Employees, Denied Plaintiff Access to His Medical Records, and Those He Authorized to Obtain Said Records, in Direct Violation of the Medical Records Access Act, With Gross Negligence," against Defendants Haapala and Lester;

Claim XII:  "Plaintiff's Providers in This Matter Falsified Their Notes, and Altered Plaintiff's EMR, to Justify Their Discontinuation and Denial of Adequate Medical Treatment, With Gross Negligence," against Defendants Buller, Millette, and Paquette; and

Claim XIII:  "Defendants PMC and Hutchinson Violated State Law by Adamantly and Repeatedly Refusing to Provide Plaintiff With Adequate Pain Management, Which Plaintiff's Condition Clearly Indicates, Based on the Standard of Care for Osteopathic Pain."

(Docket no. 1, docket no. 1-1.)  Plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages.  (Docket no. 1-1 at 54-56.)

Plaintiff's Claims VIII and XI against Defendants Kangas, Haapala, and Lester have since been severed from this matter and dismissed without prejudice.  (*See* docket no. 121 at 15.)  The undersigned will discuss the facts and merits of Plaintiff's remaining claims relative to Defendants Motions for Summary Judgment as necessary below.

### B.     Governing Law

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket nos. 155, 185.)  Summary judgment is appropriate where the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000).  Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Once the moving party has met its burden of production, the non-moving party must come forward with significant probative evidence showing that a genuine issue exists for trial. *Covington*, 205 F.3d at 915.  A mere scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Ultimately, a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)*; Hager v. Pike County Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## C.    Analysis

The Corizon Defendants move for summary judgment on the following grounds:  (1) Plaintiff failed to exhaust his administrative remedies with regard to some of his claims; (2) some of Plaintiff's claims are barred by the statute of limitations; (3) Plaintiff failed to demonstrate a genuine issue of material fact with regard to his deliberate indifference, *Monell*, and conspiracy claims; (4) Plaintiff's gross negligence claims fail because gross negligence is not recognized as an independent cause of action in Michigan; and (5) Plaintiff's state-law claims sound in medical malpractice, and Plaintiff failed to comply with Michigan's requirements for pleading such a claim.  (Docket no. 155.)  The MDOC Defendants move for summary judgment on the grounds

that (1) Defendant PMC is entitled to sovereign immunity under the Eleventh Amendment; (2) Plaintiff has failed to establish that the individual MDOC Defendants were deliberately indifferent to his medical needs; (3) the individual MDOC Defendants are entitled to qualified immunity; and (4) the court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (Docket no. 185.)

### 1.    Plaintiff's Voluntary Dismissal of Claims

As an initial matter, Plaintiff, in response to Defendants' Motions, voluntarily dismisses his claims against Defendants Corizon, Papendick, and Brown, as well as his state-law claims.[2] (Docket no. 172 at 34, docket no. 189 at 23, 33; *see* docket no. 1 ¶¶ 248-49, 264-65, 267, docket no. 1-1 ¶¶ 689-854, docket no. 155 at 38, 44-47, docket no. 185 at 29, 34-35.)  Plaintiff also voluntarily dismisses one of his claims against Defendant Byrne, which arose from her refusal to issue Plaintiff his prescribed pain medication after the healthcare medication window had closed on March 15, 2013.  (Docket no. 189 at 18; *see* docket no. 1 ¶¶ 143-157, docket no. 185 at 26.)

At this stage of the proceedings, Plaintiff may voluntarily dismiss these claims "only by court order, on terms that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  Unless the order states otherwise, a Rule 41(a)(2) dismissal is without prejudice.  Fed. R. Civ. P. 41(a)(2).  In addressing a request for dismissal under Rule 41(a)(2), courts should consider whether the defendant would suffer "plain legal prejudice" as a result of the dismissal without prejudice. *Grover by Grover v. Eli Lilly and Co.*, 33 F.3d 716, 718 (6th Cir. 1994).  Factors relevant to determining such prejudice are "the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary

---

[2] Plaintiff's state-law claims are encompassed within a portion of Claim X, Claim XI, which was previously severed and dismissed, and Claims XII and XIII in their entirety.  (*See* docket no. 1-1 ¶¶ 689-854.)

judgment has been filed by the defendant." *Bridgeport Music, Inc. v. Universal-MCA Music Publ'g., Inc.*, 583 F.3d 948, 953 (6th Cir. 2009) (citation omitted).

This matter has been pending for nearly three years, during which Defendants have spent much time, effort, and expense in defending this action and have now filed their respective Motions for Summary Judgment. At this late juncture, Plaintiff seeks dismissal of his claims against Defendants Corizon, Papendick, and Brown, one of his claims against Defendant Byrne, and his state-law claims, with little to no explanation. The only explanation provided by Plaintiff is that he cannot locate any Step I grievances filed against Defendants Corizon and Papendick (docket no. 172 at 34), seemingly conceding Defendants' argument that Plaintiff did not exhaust his administrative remedies against them (*see* docket no. 155 at 38). Under these circumstances, the undersigned finds that Defendants would suffer plain legal prejudice if these claims were dismissed without prejudice. It is therefore recommended that Plaintiff's claims against Defendants Corizon, Papendick, and Brown, Plaintiff's claim against Defendant Byrne that arose on March 15, 2013, and Plaintiff's state-law claims be dismissed *with* prejudice.

### 2. *Exhaustion of Administrative Remedies*

The Corizon Defendants argue that Defendants Buller, Grahn, Paquette, Millette, Hutchinson, Johnston, and Wilson are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies against them under the Prison Litigation Reform Act.[3] (Docket no. 155 at 32-38.) The Prison Litigation Reform Act (PLRA) of 1995 requires that a

---

[3] In support of this argument, the Corizon Defendants incorporate by reference the applicable MDOC grievance policies and procedures recited by the MDOC Defendants in their previously-filed Motion for Summary Judgment. (Docket no. 155 at 33 n.3.) The Corizon Defendants also rely on a certified copy of Plaintiff's Step III Grievance Report, which identifies all grievances that Plaintiff pursued through Step III of the grievance process between May 2009 and September 28, 2017, and was submitted by the MDOC Defendants in support of their previously-filed Motion for Summary Judgment. (Docket no. 125-3.) Accompanying the Step III Grievance Report is the underlying documentation for the grievances on the Report that are related to Plaintiff's health care and relevant to the time period in the instant matter. (*See* docket no. 125 at 7-9; docket no. 125-3.)

prisoner exhaust all administrative remedies before filing a section 1983 action.  Specifically, the statute provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory and requires a prisoner to comply with state procedural rules such as time limits for filing grievances and other critical procedural rules "because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

The Michigan Department of Corrections (MDOC) Policy Directive 03.02.130 regarding prisoner grievances[4] requires a prisoner to file a Step I grievance within five days of attempting to resolve the grievable issue with prison staff.  MDOC Policy Directive 03.02.130(V).  The Step I grievance must include "the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how)," and the "[d]ates, times, places, and names of all those involved in the issue being grieved."  MDOC P.D. 03.02.130(R) (emphasis in original); *Burton v. Jones*, 321 F.3d 569, 574 (6th Cir. 2003), *abrogated on other grounds by Jones v. Bock*, *supra*, ("[W]e understand [MDOC] policies to preclude administrative exhaustion of a claim against a prison official if the first allegation of mistreatment or misconduct on the part of that official is made at Step II or Step III of the grievance process.").  If the prisoner is dissatisfied with the Step I response, he may file an appeal, referred to as a Step II grievance, "within ten business days after receiving the Step I response or, if no response was received, within ten business days after the date the response was due."  MDOC Policy Directive 03.02.130(BB).  A similar procedure applies to the Step III

---

[4] The MDOC Defendants attached a copy of MDOC Policy Directive 03.02.130 to their March 5, 2018 Motion for Summary Judgment.  (Docket no. 125-2.)

grievance process in that if a prisoner is dissatisfied with the Step II response, the prisoner "must send a completed Step III grievance, using the Prisoner/Parolee Grievance Appeal form . . . , to the Grievance and Appeals Section within ten business days after receiving the Step II response or, if no response was received, within ten business days after the date the response was due." MDOC Policy Directive 03.02.130(FF). A grievance may be rejected if it is filed in an untimely manner. MDOC Policy Directive 03.02.130(G). A prisoner's administrative remedies are exhausted once his complaints have been grieved through all three steps of the grievance process in compliance with the policy. MDOC Policy Directive 03.02.130(B).

It is not the prisoner's burden to plead or prove that he has successfully exhausted his administrative remedies in his complaint. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Rather, failure to exhaust administrative remedies is an affirmative defense, *Jones*, 549 U.S. at 216, and so Defendants carry the burden of proof on the issue, *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012). "In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles*, 678 F.3d at 455-56 (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). In such cases, "[s]ummary judgment is appropriate only if defendants establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion." *Id.* (citing *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

When the defendants have met their initial summary judgment burden of demonstrating that the plaintiff failed to properly exhaust his administrative remedies, the plaintiff is required to produce "affirmative contrary evidence establishing the existence of a material question of fact on

the exhaustion issue," that is, "some proper evidence that [he] had, in fact, filed and appealed the relevant grievances through all three steps of the Policy's grievance process." *August v. Caruso*, No. 12-13775, 2013 WL 5291577, at *5 (E.D. Mich. Sept. 19, 2013), *report and recommendation adopted*, No. 2:12-cv-13775, 2013 WL 6816472 (E.D. Mich. Dec. 24, 2013) (citing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (party opposing a motion for summary judgment "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion.") (citation and internal quotation marks omitted)).

### a.   Defendants Buller and Grahn

The Corizon Defendants concede that Plaintiff fully exhausted Grievance RMI-13-10-2297-12d1 ("2297") against Defendant Grahn for denying his request for a corticosteroid injection on October 22, 2013, and Grievance RMI-12-12-2016-12f ("2016") against Defendant Buller for prescribing Excedrin to Plaintiff at a reduced dosage on November 24, 2012.  (Docket no. 155 at 33 (citing docket no. 1 ¶ 103, docket no. 1-1 ¶ 791, docket no. 125-3 at 78, docket no. 155-9 at 20).)  Defendants assert that Plaintiff failed to exhaust his administrative remedies with regard to any of his other claims against Defendants Buller and Grahn and that those claims should therefore be dismissed.[5]  (*Id*. at 33-34.)  Defendants also assert that certain of Plaintiff's claims against Defendant Buller and Grahn, namely those arising on or before May 23, 2013, should be dismissed because they fall outside of the three-year statute of limitations.  (*Id*. at 34 n.5.)

---

[5] Defendants acknowledge that Plaintiff filed also filed Grievance RMI-12-04-0567-12f3 against Defendant Buller, but they assert that it was not properly exhausted because it was rejected as untimely.  (*Id*. at 34 n.4 (citing docket no. 1 ¶ 66, docket no. 1-1 ¶ 782, docket no. 155-9 at 22).)

In response, Plaintiff contends that he exhausted Grievance 2016 against both Defendants Buller and Grahn, that he also exhausted Grievances 1777 and 1837 against Defendants Buller and Grahn, and that Grievance 0567 was improperly rejected as untimely.  (Docket no. 172 at 31-32.)  Regarding the statute of limitations, Plaintiff argues that Defendants have failed to demonstrate that his complaints were not "ongoing violations."  (*Id*. at 32.)  He also argues that the statute is tolled while grievances are exhausted.  (*Id*.)

In order for Plaintiff's pursuit of Grievance 2016 through Step III of the grievance process to have exhausted any claims against Defendant Grahn, Plaintiff must have raised his grievance against Defendant Grahn at Step I of the grievance process.  *See* MDOC P.D. 03.02.130(R); *Burton*, 321 F.3d at 574, *supra*.  Plaintiff, however, did not name Defendant Grahn or detail the facts and circumstances of Defendant Grahn's alleged misconduct in Grievance 2016 at Step I of the grievance process (or at any of the subsequent steps).  Accordingly, Grievance 2016 does not exhaust any of Plaintiff's claims against Defendant Grahn.

Next, while Plaintiff asserts that he also exhausted his administrative remedies against Defendants Buller and Grahn through Grievances 1777 and 1837, as Defendants point out, there is no record of these grievances existing.  (*See* docket no. 173 at 2.)  Indeed, Plaintiff has not submitted any evidence related to Grievances 1777 and 1837, and the Step III Grievance Report on which Defendants rely does not contain an entry for these grievances.  Thus, to the extent that Plaintiff filed grievances with the identifiers of 1777 and 1837 against Defendants Buller and Grahn, he did not pursue them through Step III of the grievance process, and any claims contained within were not properly exhausted in accordance with MDOC policy.

With regard to Grievance 0567, the MDOC rejected it as untimely because Plaintiff failed to comply with MDOC P.D. 03.02.130(P), which provides that "[p]rior to submitting a written

grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue." (Docket no. 155-9 at 22; docket no. 125-2 at 4.) As the records indicate, Plaintiff became aware of the grievable issue when Defendant Grahn allegedly discontinued his Excedrin on March 21, 2012, but Plaintiff did not attempt to resolve the issue until April 11, 2012, when he submitted a medical kite. (Docket no. 155-9 at 25.) Because April 11, 2012 is more than two business days after the March 21, 2012 date that his Excedrin was discontinued and the issue became grievable, the MDOC properly rejected Grievance 0567 as untimely. Moreover, as further discussed below, this claim and many of Plaintiff's other claims against Defendants Buller and Grahn are barred by the statute of limitations.

The Corizon Defendants assert that some of Plaintiff's claims against Defendants Buller and Grahn are barred by the statute of limitations. (Docket no. 155 at 34 n.5.) Plaintiff's Complaint, which is dated June 27, 2016, contains allegations against Defendants Buller and Grahn arising as early as November 3, 2011. (Docket no. 1 ¶¶ 48-119.)

Federal courts apply state personal injury statutes of limitations to claims brought under § 1983. *Wilson v. Garcia*, 471 U.S. 261 (1985); *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005). For civil rights suits filed in Michigan, the statute of limitations is three years. Mich. Comp. Laws § 600.5805(8); *Carroll v. Wilkerson*, 782 F.2d 44, 44-45 (6th Cir. 1986). The statute of limitations begins to run in a § 1983 action when a plaintiff knows or has reason to know of the act providing the basis for the injury has occurred. *See Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citing *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). But the statute of limitations for claims subject to the PLRA is tolled during the period in which a prisoner is in the process of properly exhausting his available

administrative remedies. *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000). Therefore, the limitation period did not run while Plaintiff invoked the MDOC grievance process.

Plaintiff makes claims against Defendants Buller and Grahn regarding actions that they took (or failed to take) regarding Plaintiff's medical treatment on November 3, 2011, December 18, 2011, January 11, 2012, March 21, 2012, May 22, 2012, September 11, 2012, September 27, 2012, November 4, 2012, November 24, 2012, and May 23, 2013. (Docket no. 1 ¶¶ 48-119.) Based on these dates, each of these claims are barred by the three-year statute of limitations, as Plaintiff did not file his Complaint in this matter until June 27, 2016.

Plaintiff argues in passing that his complaints against Defendants Buller and Grahn were "ongoing violations." (Docket no. 172 at 32.) Plaintiff does not develop this argument in any meaningful way. Presumably, it is Plaintiff's position that the actions taken by Defendants Buller and Grahn are part of an ongoing or "continuing violation" of his rights, such that the later violations committed by Defendants Buller and Grahn, *e.g.*, in October 2013, would bring their earlier alleged violations into the limitations period. The "continuing violation" doctrine, however, is no longer available to plaintiffs like Mr. Owusu, who allege a series of discrete violations of their civil rights and attempt to rely on the timeliness of the later-arising claims to save their untimely claims. *See Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (discussing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and holding, "*Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception [to the statute of limitations] by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period."). *See also Siggers v. Campbell*, 652 F.3d 681, 692-93 (6th Cir.

2011) ("continuing violation" doctrine inapplicable where plaintiff alleges and/or grieves discrete acts of harm).

Plaintiff also argues (correctly) that the statute of limitations is tolled during the grievance process.  But as discussed above, the record indicates that Plaintiff did not properly exhaust his administrative remedies with regard to his claims against Defendants Buller and Grahn that arose before June 27, 2013, except for his November 24, 2012 claim against Defendant Buller for prescribing Excedrin to Plaintiff at a reduced dosage, which, as previously discussed, he exhausted through Grievance 2016.  According to Plaintiff and the underlying grievance documentation, Grievance 2016 was exhausted on June 25, 2013.  (Docket no. 1 ¶ 70; docket no. 155-9 at 18.) Thus, the statute of limitations for Plaintiff's November 24, 2012 claim against Defendant Buller was tolled until June 25, 2013.  Plaintiff, however, did not file his Complaint until June 27, 2016, two days after the statute of limitations expired.  Plaintiff's November 24, 2012 claim against Defendant Buller is therefore barred by the statute of limitations.

Accordingly, all of Plaintiff's claims against Defendants Buller and Grahn should be dismissed for failure to exhaust and/or because they are barred by the statute of limitations, except for Plaintiff's claim that Defendant Grahn improperly denied his request for a corticosteroid injection on October 22, 2013, which Plaintiff exhausted through Grievance 2297.  The Corizon Defendants' Motion for Summary Judgment should therefore be granted in part and denied in part with regard to the exhaustion of Plaintiff's claims against Defendants Buller and Grahn.

b.   Defendant Paquette

The Corizon Defendants also assert that Plaintiff failed to exhaust his administrative remedies against Defendant Paquette.  (Docket no. 155 at 34-35.)  First, they assert that Plaintiff did not exhaust his administrative remedies with regard to any claims against Defendant Paquette

through Grievance URF-15-07-2160-12f ("2160") because Plaintiff did make any allegations against Defendant Paquette at Step I of that grievance process. (*Id.*) The Corizon Defendants also argue that Plaintiff did not properly exhaust his administrative remedies through his other grievances against Defendant Paquette, URF-16-08-2902-12D3 ("2902"), URF-15-09-3208-12d3 ("3208"), and URF-15-09-3315-12E3 ("3315"), because they were all rejected as untimely filed. (*Id.* at 35.)

In response, Plaintiff concedes that Grievance 2160 was not a complaint against Defendant Paquette and that it therefore did not exhaust any administrative remedies regarding his claims against her. (Docket no. 172 at 32.) Plaintiff contends, however, that he alleged and exhausted Grievances 15-3047-28E ("3047"), 3208, and 3315 against Defendant Paquette, and he also asserts that Grievances 2902 and 3315 were improperly rejected as untimely. (*Id.* (citing docket no. 1 ¶¶ 316, 323, 357).)

A review of the Step III Grievance Report does not reveal a listing for Grievance 3047, which means that Plaintiff did not pursue this grievance through Step III of the grievance process.[6] (*See* docket no. 125-3 at 4-21.) And as the Corizon Defendants assert, Grievance 3208 was in fact rejected as untimely. (*Id.* at 9.) Accordingly, Plaintiff did not properly exhaust his administrative remedies against Defendant Paquette through these two grievances.

With regard to Grievance 3315, the court previously found that there was a question of fact as to whether it had been properly rejected as untimely because there was no indication that the MDOC considered Plaintiff's November 2015 intervening transfer from URF to LCF in its determination of untimeliness. (Docket no. 157 at 9-11, docket no. 162.) Thus, the only remaining grievance at issue related to Defendant Paquette is Grievance 2902.

---

[6] Plaintiff seemingly transposed the numbers for Grievance 3047 in his response brief as "0347." (Docket no. 172 at 32.) Notably, the Step III Grievance Report also does not contain a grievance with an identifier of "0347."

Plaintiff's argument regarding the timeliness of Grievance 2902 is a bit convoluted, but it seems to center around the timeliness of the Grievance at Step I. (Docket no. 172 at 32-33.) As Defendants point out however, Grievance 2902 was not rejected as untimely at Step I but at Steps II and III. (Docket no. 173 at 3 (citing docket no. 155-9 at 1, 3).) Plaintiff does not dispute or provide any significant probative evidence to contradict the untimeliness determinations of Grievance 2902's Step II and III appeals. Moreover, the Sixth Circuit has ruled that a prisoner may not exhaust his administrative remedies during the pendency of a federal lawsuit. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). But here, Plaintiff initiated Grievance 2902 on August 3, 2016, more than a month after he filed the Complaint in this matter. Accordingly, the evidence establishes, in a manner in which no reasonable jury could disbelieve it, that Plaintiff did not properly exhaust his administrative remedies with regard to Grievance 2902 in accordance with MDOC Policy Directive 03.02.130 or *Freeman*. Thus, all of Plaintiff's claims against Defendant Paquette, except those associated with Grievance 3315 should be dismissed for failure to exhaust, and the Corizon Defendants' Motion for Summary Judgment should be granted in part and denied in part in this regard.

c. Defendant Millette

The Corizon Defendants concede that Plaintiff exhausted Grievance URF-14-10-3377-12d3 ("3377") against Defendant Millette regarding his October 22, 2014 treatment for back pain. (Docket no. 155 at 35 (citing docket no. 1 ¶ 216, docket no. 125-3 at 64-69).) Defendants assert, however, that contrary to Plaintiff's assertions, Grievance 3377 did not exhaust Plaintiff's claims against Defendant Millette regarding Paget's disease because Plaintiff did not raise the issue of Paget's disease at Step I of the grievance process. (*Id*. at 35-36 (citing docket no. 1 ¶ 224, docket

no. 125-3 at 67); docket no. 173 at 3.)   Defendants assert that those claims should therefore dismissed for failure to exhaust.  (*Id*. at 36.)

Plaintiff disputes Defendants' assertion that he did not exhaust the issue of Paget's disease through Grievance 3377, arguing that the grievance alleged a lack of adequate treatment.  (Docket no. 172 at 33 (citing docket no. 125-3 at 67).)  Plaintiff argues that he also exhausted Grievances 14-3275-12F ("3275"), 15-0269-12D3 ("0269"), 15-1247-12D3 ("1247"), 15-0817-1G ("0817"), and 15-1208-12D3 ("1208") against Defendant Millette.  (*Id*. (citing docket no. 1 ¶¶ 213, 216, 236, 425, 486).)

According to Plaintiff's Complaint, Grievance 3275 relates to Defendant Millette's alleged denial of "stronger, 'non-formulary' itch-relieving medication;"  Grievance 0269 relates to Defendant Millette's alleged "complete denial of treatment for [P]laintiff's obvious, debilitating Paget's-like symptoms;"  Grievance 1247 relates to Defendants Millette and Hutchinson's denial of treatment for and deliberate indifference of Plaintiff's elevated AKP enzyme; and Grievances 0817 and 1208 relate to Defendants Wilson and Millette's treatment of Plaintiff's wrist/thumb injury.  (Docket no. 1 ¶¶ 213, 236, 425, 486.)  Grievances 3275, 0269, 1247, 0817, and 1208 are not listed on the Step III Grievance Report, which means that Plaintiff did not properly pursue these Grievances through Step III of the grievance process.  Accordingly, Plaintiff has failed to exhaust the claims against Defendant Millette (and the other defendants) that are associated with these grievances.

With regard to Grievance 3377, Defendants are correct.  At Step I, Plaintiff grieves a lack of adequate treatment of his progressively worsening "spinal degenerative condition," citing an x-ray that revealed retrolisthesis and Defendant Millette's alleged conclusion that no change in treatment was necessary.  (Docket no. 125-3 at 67.)  To properly exhaust his administrative

remedies for his Paget's-disease-related claims against Defendant Millette in accordance with MDOC policy, Plaintiff was required to grieve the issue and state the facts related thereto at Step I of the grievance process.  *See* MDOC P.D. 03.02.130(R); *Burton*, 321 F.3d at 574, *supra*. Plaintiff, however, did not raise the issue of Paget's disease until Steps II and III of Grievance 3377.  (Docket no. 125-3 at 65, 69.)

Although Plaintiff pursued Grievance 3377 through Steps II and III of the grievance process, the MDOC's consideration of the Step II and Step III appeals does not cure Plaintiff's failure to grieve the issue Paget's disease at Step I.  "To be sure, [the Sixth Circuit] has refused to enforce procedural requirements when 'prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits.'"  *Lee v. Willey*, 789 F.3d 673, 680 (6th Cir. 2015) (quoting *Reed–Bey v. Pramstaller,* 603 F.3d 322, 325 (6th Cir. 2010)).  But that is not the case here, as the MDOC's Step II and Step III Responses did not address the later-raised issue of Paget's disease; the MDOC explicitly considered and resolved the Step II and Step III appeals based only on Plaintiff's original complaint at Step I that he was being denied adequate treatment for pain related to his degenerative spinal condition and never once mentioned or addressed Plaintiff's newly-asserted claims regarding Paget's disease.  (*See* docket no. 125-3 at 64, 66.)  Accordingly, the principle promulgated in *Reed-Bey* provides no safe harbor for Plaintiff with regard to exhaustion of his Paget's-disease-related claims against Defendant Millette.  *See Lee*, 789 F.3d at 680-81.

For these reasons, all of Plaintiff's claims against Defendant Millette, except for those related to Defendant Millette's treatment of Plaintiff for back pain on October 22, 2014 should be dismissed for failure to exhaust.  The Corizon Defendants' Motion for Summary Judgment should therefore be granted in this regard.

        d.    <u>Defendant Hutchinson</u>

The Corizon Defendants concede that Plaintiff fully exhausted two grievances against Defendant Hutchinson: (1) Grievance LCF-16-01-0007-12f ("0007"), in which he alleged that Dr. Hutchinson was denying him treatment for the hepatitis C virus (HCV) and that the pain medication recommended or approved by Defendant Hutchinson was destroying his liver and causing joint and bone pain; and (2) Grievance URF-l5-09-3048-12f ("3048"), in which Plaintiff challenged Defendant Hutchinson's course of hepatitis treatment as well as Defendant Hutchinson's recommendation of Tylenol for pain management.  (Docket no. 155 at 36; docket no. 125-3 at 27-31, 49-53.)  The Corizon Defendants argue, however, that Plaintiff did not exhaust any claims against Defendant Hutchinson through Grievance LCF-16-03-0246-12f ("0246") because he did not make any allegations against Defendant Hutchinson at Step 1 of that grievance. (Docket no. 155 at 36 n.1.)  Therefore, the Corizon Defendants argue that Plaintiff's claims against Defendant Hutchinson are limited to those he exhausted through Grievances 0007 and 3048.  (*Id.* at 36-37.)

In response, Plaintiff asserts that he does not allege that Grievance 0246 exhausted a claim against Defendant Hutchinson.  (Docket no. 172 at 33.)  Plaintiff also asserts that he did, however, exhaust two additional grievances against Defendant Hutchinson – Grievances 1247 and 0070.  As discussed above, however, Grievance 1247 is not listed on the Step III Grievance Report, which means that Plaintiff did not properly pursue it through Step III of the grievance process and therefore did not exhaust the claims alleged therein against Defendant Hutchinson.  There is also no grievance listed on the Step III Grievance Report with an identifier of "0070," however, on the Step I and Step II Responses to Grievance 0007, the MDOC appears to have transposed the numbers as "0070."  (Docket no. 125-3 at 29, 31.)  To the extent that Plaintiff is referring to these

two documents which are a part of the documentation for Grievance 0007, the Corizon Defendants concede that Plaintiff has fully exhausted his remedies in that grievance, and there is no dispute here.  Accordingly, the Corizon Defendants' Motion should be granted with regard to Defendant Hutchinson, and all of Plaintiff's claims against him should be dismissed for failure to exhaust except for those exhausted through Grievances 0007 and 3048.

e.   Defendant Johnston

The Corizon Defendants assert that Plaintiff's claims against Defendant Johnston should be dismissed for failure to exhaust because Grievance LCF-16-03-0192-12f ("0192") did not lodge an allegation against Defendant Johnston at Step I grievance process, but only at Step II, and because Grievance LCF 16-02-0104-28b ("0104") was rejected as vague.  (Docket no. 155 at 37 (citing docket no. 125-3 at 25; docket no. 155-9 at 7-10).)

Plaintiff responds that he did not allege that Grievance 0192 exhausted a claim against Defendant Johnston, but he does dispute Defendants' challenge to the exhaustion of Grievance 0104.  (Docket no. 172 at 33.)  Specifically, Plaintiff argues that Grievance 0104 was improperly rejected as vague for the reason that Plaintiff used his legal name and did not include his committed name on the grievance.  (Docket no. 172 at 33-34.)  Plaintiff argues that this is contrary to MDOC PD 03.01.110, which provides that MDOC employees should refer to prisoners by their legal name if known and that prisoners shall not be forced to refer to themselves by their commitment name if they have a new legal name.  (*Id*. at 34.)  Plaintiff argues that the MDOC's rejection of the grievance as vague was therefore pretextual and arbitrary.  (*Id*.)

Defendants reply that the MDOC rejected Grievance 0104 for two separate reasons – because it was vague and because it failed to include his commitment name.  (Docket no. 173 at 4.)  Indeed, the Step I Grievance Rejection Letter reads as follows:

> The Step I grievance originally coded with ID #LCF-16-02-104-12F has been recoded [as LCF-16-02-104-28B] and rejected due to the complaint being vague. PD 03.01.110 requires that the commitment name be reflected on department documents.  PD 03.02.130 defines the grievance process and what is considered grievable and non-grievable.  If you have any questions, consult PD 03.02.130 "Prisoner/Parolee Grievances" which is available in the institutional library. Grievance is rejected at Step I.

(Docket no. 155-9 at 10.)  And as Defendants point out, the MDOC continued to uphold the Step I grievance rejection at Steps II and III despite the fact that Plaintiff included both his legal and commitment names on his Step II and III appeals.  (Docket no. 173 at 4.)

The evidence reflects that while MDOC PD 03.01.110 requires employees to refer to prisoners by their legal name and prohibits employees from forcing prisoners to refer to themselves by their commitment name, it also requires prisoners to include their commitment name on all department documents.  Because Plaintiff did not include his commitment name on his Step I grievance, the MDOC's denial of Plaintiff's Step I grievance on this basis was not improper. Plaintiff argues that the Grievance Coordinator at LCF is the only grievance coordinator that enforced PD 03.01.110 against him.  (Docket no. 172 at 34.)  But that is irrelevant here. Additionally, this is not the same type of case as *Reed-Bey, supra*, where prison officials declined to enforce their own procedural requirements and opted to consider otherwise-defaulted claims on the merits.  Here, the MDOC also rejected Plaintiff's Grievance 0104 because it was vague. Plaintiff does not otherwise challenge the MDOC's determination of vagueness in his response brief, and the undersigned declines to develop an argument in this regard on Plaintiff's behalf.

The MDOC rejected the only grievance that Plaintiff pursued against Defendant Johnston through Step III of the grievance process, Grievance 0104, because of procedural defects and not on the merits. Because the merits of Plaintiff's grievance were not addressed, the administrative remedies available to Plaintiff were not properly exhausted under *Woodford*.  Accordingly, the

Corizon Defendants' Motion for Summary Judgment should be granted with regard to Defendant Johnston.

### f.   Defendant Wilson

In the Complaint, Plaintiff asserts that he filed Grievance 15-03-0598-12E3 ("0598") against Defendant Wilson for her failure to specify orders for a second five-day pack of Medrol-prednisone in February 2015.  (Docket no. 1 ¶ 249.)  The court has previously determined that there is a genuine issue of material fact as to whether Plaintiff exhausted his administrative remedies with regard to this grievance.  (Docket no. 157 at 7-9, docket no. 162.)  The Corizon Defendants assert that assuming *arguendo* that Plaintiff did fully exhaust this grievance, his claims against Defendant Wilson are limited to the allegations raised in this grievance only, as Plaintiff did not exhaust his administrative remedies with regard to any of his other claims against Defendant Wilson. (Docket no. 155 at 37-38.)  Plaintiff counters that he also exhausted Grievances 0817 and 1208 against Defendant Wilson.  As discussed above, however, Grievances 0817 and 1208 are not listed on the Step III Grievance Report, which means that Plaintiff did not properly pursue these Grievances through Step III of the grievance process.  Accordingly, the Corizon Defendants' Motion should be granted with regard to Defendant Wilson; specifically, all of Plaintiff's claims against Defendant Wilson should be dismissed for failure to exhaust except for her alleged failure to specify orders for a second five-day pack of Medrol-prednisone.

### 3.   *Defendant PMC*

The MDOC Defendants assert that Defendant PMC is entitled to Eleventh Amendment immunity with respect to Plaintiff's claims.  (Docket no. 185 at 18-19.)  The Eleventh Amendment bars "all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments," provided the state has not waived its immunity and Congress has not expressly

abrogated Eleventh Amendment immunity by statute.  *Thiokol Corp. v. Dep't of Treasury, State of Michigan, Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993) (citations omitted).  The State of Michigan has not consented to being sued in civil rights actions in federal court.  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citation omitted).  And Congress has not abrogated state sovereign immunity in civil rights actions.  *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993).  Defendant PMC is an administrative unit within the MDOC and is therefore afforded the same constitutional protections as the MDOC.  *Wilson v. Bohjanen*, No. 2:14-CV-11, 2015 WL 4904887, at *8 (W.D. Mich. Aug. 17, 2015).  Plaintiff's claims against Defendant PMC are therefore barred by the Eleventh Amendment.

Defendant PMC is also not subject to suit under 42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must prove "that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001) (citations omitted).  States and governmental entities that are considered "arms of the State" for Eleventh Amendment purposes, like Defendant PMC, are not persons under § 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989).  For these reasons, the MDOC Defendants' Motion for Summary Judgment should be granted with respect to Plaintiff's claims against Defendant PMC.

The undersigned will now proceed to address Plaintiff's *remaining* claims on the merits.

### 4.      *Deliberate Indifference*

Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  (Docket no. 1.)  To support a claim of deliberate indifference under the Eighth Amendment, a Plaintiff must satisfy two components: an objective

component, and a subjective component. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

"The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). A plaintiff meets this requirement by showing that he or she has a serious medical condition with a serious medical need,[7] and that (1) prison officials failed to provide treatment for the condition; or (2) ongoing treatment for the condition was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005). If the plaintiff alleges inadequate treatment, "[t]here must be 'medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain," and the plaintiff must "also must place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Id.* at 737-38 (citations and internal quotation marks omitted).

Under the subjective component, "a plaintiff must show that the defendants acted with deliberate indifference." *Rhinehart*, 894 F.3d at 738. An official acts with deliberate indifference when he consciously disregards an excessive or substantial risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, the plaintiff must prove "that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

---

[7] A sufficiently serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 897 (6th Cir. 2004) (emphasis and citations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Hill v. Haviland*, 68 F. App'x 603, 604 (6th Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Thus, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5. Ultimately, the court must consider the wide discretion allowed to prison officials in their treatment of prisoners under authorized medical procedures. *See Westlake*, 537 F.2d at 860. "[W]hether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. A decision to not administer a certain form of medical treatment does not represent cruel and unusual punishment. *Id*.

### a. Defendant Grahn

Plaintiff claims that Defendant Grahn was deliberately indifferent to his serious medical needs by denying his request for a corticosteroid injection on October 22, 2013. (Docket no. 1 ¶¶ 100-03.) According to Plaintiff, Defendant Grahn declined to give Plaintiff a steroid injection because it was "too soon" since the last injection on May 22, 2013. Defendant Grahn also allegedly wanted Defendant Buller to evaluate Plaintiff before any further injections were administered. Plaintiff's medical records confirm Plaintiff's allegations. (*See* docket no. 156 at 153-54.) Plaintiff essentially disagrees with Defendant Grahn's medical judgment that it was too soon after Plaintiff's previous steroid injection to administer another one. As discussed above, disagreements in medical judgment and decisions to not administer a certain form of treatment do not constitute deliberate indifference. *See Hill, Estelle, supra.*

25

b.      Defendant Byrne

Plaintiff claims that Defendant Byrne was deliberately indifferent when she denied Plaintiff's request for hydrocortisone cream on December 30, 2012.[8]  Specifically, Plaintiff alleges that he began itching on or about November 7, 2012, and that he called healthcare on December 30, 2012, after he ran out of hydrocortisone cream and the itching became severe.  Defendant Byrne took the call, and Plaintiff explained that he was experiencing severe itching and "scratching himself bloody," and he attributed the itching to an allergic reaction to his pain medication, Depakote.  After an allegedly contentious conversation, Defendant Byrne called Plaintiff to the clinic, examined Plaintiff, stated that she didn't see a rash, and suggested that Plaintiff would not have rash from a medication that he had been taking for three months.  Plaintiff argued that he never claimed to have a rash, just itching, and he asked Defendant Byrne for a tube of hydrocortisone cream, which Defendant Byrne allegedly denied.  Plaintiff alleges that Defendant Byrne's alleged denial of hydrocortisone cream forced him "to suffer the misery of severe itching and sleeplessness the rest of the night."  According to Plaintiff, however, Defendant Byrne left notes instructing RN Bowker to call Plaintiff out to healthcare the next morning and give Plaintiff a tube of hydrocortisone cream.  The record reflects that RN Bowker followed these instructions, noted the presence of a red, non-raised rash, and opined that Plaintiff had a mild case of dermatitis rather than an allergic reaction to Depakote.  Plaintiff admits that the cream gave him some relief. (Docket no. 1 ¶¶ 120-41; docket no. 185-4 at 23-24; docket no. 189 at 15-18.)

When faced with deliberate indifference claims related to itching, dermatitis/eczema, and rashes, courts have found that the prisoner failed to allege a serious medical condition.  *See Sledge*

---

[8] Plaintiff exhausted Grievance RMI-13-01-0026-12e4 with regard to this claim on July 31, 2013.  (Docket no. 125-3 at 13, 88.)

*v. Kooi,* 564 F.3d 105 (2nd Cir. 2009) (alleged eczema, back pain, stomach disorders, allergies, and asthma did not constitute a "serious medical need" on which to premise an Eighth Amendment claim of deliberate medical indifference); *Tsakonas v. Cicchi,* 308 F. App'x 628, 632 (3d Cir. 2009) (affirming the dismissal of an Eighth Amendment claim premised upon a denial of treatment for weight loss, eczema of the feet, seborrhea of the scalp, athlete's foot, constipation, and swollen knuckles); *Tasby v. Cain,* 86 F. App'x 745 (5th Cir. 2004) (plaintiff's assertion that he developed a rash from being placed in restraints "does not establish that he suffered serious harm"); *Watson v. McClain,* No. 3:14-cv-0132, 2014 WL 4715677, at *3 (N.D. Ohio Sept. 22, 2014) (conditions such as occasional indigestion or constipation, dandruff, acne, vitiligo, chapped lips, dry hands, most headaches, most colds, seasonal allergies, eczema, and muscle ache from exertion, which dictate treatment for cosmetic purposes or purposes of convenience or comfort are not serious medical needs); *McKeithan v. Beard*, No. 06-965, 2010 WL 2028091, at *3-4 (W.D. Pa. Apr. 12, 2010), *report and recommendation adopted*, No. 06-965, 2010 WL 2028092 (W.D. Pa. May 21, 2010) (prisoner's choice to respond to itchy skin by scratching until his skin bled did not transform otherwise non-serious medical conditions of "intense itching" or rashes causing pain and itching into the type of severe deprivation necessary to implicate the Eighth Amendment); *Gonzalez–Reyna v. Ellis,* No. 1:09cv522 (AJT/TCB) 2009 WL 2421482, at *3 (E.D. Va. July 27, 2009) ("[I]t is doubtful that a skin rash, even one which causes pain and itching, is a sufficiently serious medical need to support an Eighth Amendment violation."); *Samuels v. Jackson,* 1999 WL 92617, at * 1-3 (S.D.N.Y. Feb. 22, 1999) (prisoner's "[p]apules, vesicles, pustules, burrows, and intense itching resulting in eczema" did not constitute a sufficiently "serious medical need" for purposes of Eighth Amendment).  Thus, Defendant Byrne's failure to provide Plaintiff with hydrocortisone

cream until the following day does not implicate the Eighth Amendment's prohibition against cruel and unusual punishment. [9]

c.   <u>Defendant Millette</u>

With regard to Defendant Millette, Plaintiff claims that he was deliberately indifferent to Plaintiff's medical needs on October 22, 2014, when he refused to recommend a change to Plaintiff's treatment plan, an updated MRI, or a consultation with an osteopathic or neurosurgical specialist, despite recent x-ray results that revealed the presence of retrolisthesis in his lower back. (*Id.* ¶¶ 214-17.)

The record reflects that Plaintiff had an appointment with Defendant Millette on September 30, 2014, at which he complained of "three prominent bony forms" in his lower back that made him feel like he was "sleeping on rocks." Plaintiff also complained that his back pain was worse in the morning and that it was difficult to stand straight initially. Defendant Millette noted that Plaintiff was able to walk without difficulty or changes in stride. Upon physical examination of Plaintiff's lumbar spine, Defendant Millette found prominent spinous process and transverse processes. Defendant Millette noted that a 2008 MRI of Plaintiff's lumbar spine showed degenerative changes with stress edema at the pedicles, and he found that to be consistent with his examination findings. Defendant Millette also noted that Plaintiff's last lumbar x-ray was on March 26, 2012, so he ordered an updated x-ray exam for comparison. Based on the exam, Defendant Millette concluded that Plaintiff's current pain management plan was appropriate and

---

[9] In the Complaint, Plaintiff also suggests that the itching could have been caused by his HCV. "[H]epatitis C likely constitutes a serious medical need sufficient to satisfy the objective component of our Eighth Amendment analysis." *Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 356 (6th Cir. 2006). However, Plaintiff was diagnosed with HCV on January 29, 2013, a month after the incident involving Defendant Byrne. To the extent that itchiness stemming from HCV could constitute a serious medical need, Plaintiff has provided no proof that Defendant Byrne subjectively perceived such a risk to Plaintiff and then disregarded that risk. *See Rhinehart*, 894 F.3d at 738. To the extent that Plaintiff alleges that Defendant Byrne misdiagnosed Plaintiff's condition, a**Error! Main Document Only.**llegations of misdiagnosis are not sufficient to establish deliberate indifference under 42 U.S.C. § 1983. *Comstock*, 273 F.3d at 703.

instructed Plaintiff to continue his current medication (including Dilantin for pain), increase his activity level, and follow his exercise program.  (Docket no. 156 at 286-91.)

The x-ray of Plaintiff's lumbar spine was taken on October 8, 2014.  It revealed, in relevant part, advanced degenerative disk changes at L4/L5 and L5/S1 with retrolisthesis of L5 in its relationship to L4 as well as diffuse facet joint arthritic changes.  (Docket no. 156 at 292.) Defendant Millette then conducted a chart review of Plaintiff's lumbar x-ray on October 20, 2014, noted that it continued to show the degenerative changes and retrolisthesis that he had found on exam, and notified Plaintiff of the results.  (*Id*. at 293.)

Plaintiff received the notification from Defendant Millette on October 22, 2014, and filed Grievance 3377 two days later, through which Plaintiff exhausted his instant claims against Defendant Millette.  In the grievance, Plaintiff asserted that the x-ray results showed a "progressive worsening of [his] spinal degenerative condition," but Defendant Millette concluded that no change in treatment was indicated.  Plaintiff asserted that his current treatment was inadequate because he had developed sciatica, had trouble bending over in the mornings to wash up, had swollen feet, and experienced numbness when standing.  (Docket no. 125-3 at 67.)  The grievance responses confirmed that upon review of the x-ray report and its correlation to his prior examination of Plaintiff, Defendant Millette determined that no change in the treatment plan was necessary.  The grievance respondents denied the grievance on the basis that Plaintiff's disagreement with the plan of care did not constitute a denial of treatment or adequate care, and they noted that Plaintiff was scheduled for further follow-up care to monitor his spinal condition. (*Id*. at 66, 68.)

Plaintiff claims that Defendant Millette was deliberately indifferent to Plaintiff's medical needs because he refused to submit Plaintiff for re-evaluation by the PMC or recommend an

updated MRI or a consultation with a specialist in light of Plaintiff's x-ray results.  The record reflects, however, that Defendant Millette reviewed Plaintiff's x-ray results and determined that they were consistent with his September 30, 2014 exam findings.  Defendant Millette therefore determined that the x-ray results did not warrant a change in the treatment plan assessed on September 30, 2014.

As noted above, "whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."  *Estelle*, 429 U.S. at 107.  And differences in judgment between an inmate and prison medical personnel regarding the appropriate treatment are not enough to state a deliberate indifference claim.  *Hill*, 68 F. App'x at 604 (citing *Estelle*, 429 U.S. at 107).  Where, like here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law."  *Westlake*, 537 F.2d at 860 n.5.  This court should be so reluctant with regard to Plaintiff's claim against Defendant Millette.

### d.   Defendant Wilson

Plaintiff claims that Defendant Wilson acted with deliberate indifference when she failed to specify orders for a second five-day pack of Medrol for Plaintiff in February 2015.  (*Id*. ¶ 249.) The Complaint, an Affidavit submitted by Defendant Wilson, and Plaintiff's medical records all establish that Defendant Wilson examined Plaintiff on February 5, 2015 regarding left thumb pain, for which she prescribed a one-week course of Medrol Dosepak, a corticosteroid medication effective in decreasing pain and medication.   (Docket no. 1 ¶¶ 242-47; docket no. 155-4; docket no. 156 at 323-27.)  The treatment notes state that Plaintiff should follow up with medical if his condition worsened or did not improve within thirty days.  (Docket no. 156 at 325.)  Plaintiff

sought a second Medrol Dosepak on February 12, 2015, but RN Filion denied Plaintiff's request, allegedly stating that Defendant Wilson had not left any orders for additional steroid treatment. (Docket no. 1 ¶ 247.) Plaintiff's February 12, 2015 medical record indicates that RN Filion and/or Defendant Millette advised Plaintiff that the Medrol Dosepak was a one-time order and that Plaintiff should resume taking his Motrin and send a kite in three to four weeks if his symptoms did not improve. (Docket no. 156 at 327.) There is no evidence that Defendant Wilson had any involvement in denying Plaintiff's request for a second Medrol Dosepak, and there is no indication that she consciously disregarded any risk to Plaintiff's health by failing to proactively issue an order for a second Medrol Dosepak. Furthermore, the record indicates that Plaintiff was instructed to resume taking Motrin to relieve any residual pain associated with his left thumb, and Plaintiff does not challenge that course of treatment as inadequate or otherwise.

e.   Defendants Kerstein and Borgerding

Defendants Kerstein and Borgerding are members of the MDOC's Pain Management Committee (Defendant PMC). Defendant PMC is an administrative unit of the MDOC that exists to regulate pain management among prisoners. (Docket no. 185 at 22.) Doctors serving on the PMC, like Defendants Kerstein and Borgerding, do not treat patients directly; they review diagnostics from the treating physicians at the correctional facilities and decide whether to prescribe certain formulary or non-formulary medications. (*Id*. at 22-23.) Plaintiff alleges that Defendants Kerstein and Borgerding were deliberately indifferent to his medical needs because they declined to prescribe the non-formulary medications that he requested, specifically Ultram and Neurontin, for his pain. (*Id*. ¶¶ 285, 308-10, 396; *see* docket no. 190 at 23-26, 28-30.) The medical records indicate, however, that Plaintiff had received several other medications for pain,

such as Pamelor, Tegretol, Depakote, Dilantin, Naproxen, Prednisone, Nortriptyline, Flexeril,

Baclofen, Excedrin, Tylenol, and Ibuprofen.  (Docket no. 190 at 18-19, 23-24, 28.)

Plaintiff's claims against Defendants Kerstein and Borgerding are substantially similar to

claims that he brought against some of his other medical providers in 2009, which were dismissed

by a court in this district, and which dismissal was affirmed by the Sixth Circuit on appeal.  *Porter

v. Pandya*, No. 09-13511-BC, 2010 WL 3464709, at *1 (E.D. Mich. Aug. 31, 2010), *aff'd* No. 10-

2182, slip op. at 2 (6th Cir. June 14, 2012).  (*See also* docket no. 114-3.)  Magistrate Judge Donald

A. Scheer stated the basis for dismissal of Plaintiff's previous claims as follows:

> [Plaintiff's] primary complaint is that the medications that have been prescribed by
> treating doctors have failed to alleviate his joint discomfort[.] Plaintiff believes the
> doctors have been deliberately indifferent to his serious medical needs because they
> refuse to provide him stronger pain medications . . . .
>
> Plaintiff's claim against Defendants Pandya, Stieve and Sarver amount to a
> disagreement with the medical conclusions reached and treatment rendered. Even
> to the extent that the conclusions or treatment were incorrect or misguided,
> "medical malpractice does not become a constitutional violation merely because
> the victim is a prisoner." *Estelle,* 429 U.S. 105. Plaintiff does not allege that any of
> the medical providers "consciously disregarded a substantial risk of serious
> harm." *Brooks,* 39 F.3d at 128. He simply disagrees with the treatment provided. A
> difference of opinion between a prisoner and the treating physician's diagnosis and
> prescribed treatment does not support an Eighth Amendment claim. *Hix v.
> Tennessee Dept. of Corrections,* 196 F. App'x 350, 356 (6th
> Cir.2006); *Westlake,* 537 F.2d. at 860 n. 5[.]

*Owusu v. Pandya*, No. 09-13511, 2010 WL 3488613, at *3 (E.D. Mich. June 30, 2010), *report and

recommendation adopted sub nom. Porter v. Pandya*, No. 09-13511-BC, 2010 WL 3464709 (E.D.

Mich. Aug. 31, 2010).

Plaintiff's instant claims against Defendants Kerstein and Borgerding are similarly

deficient.  Here, Plaintiff's treating doctors and the PMC treated Plaintiff's pain symptoms with

medication, just not the medication that Plaintiff preferred.  Plaintiff's "disagreement with the

physicians' prescriptions does not implicate the Eighth Amendment."  *Hearington v. Pandya*, 689

F. App'x 422, 427 (6th Cir. 2017). *See also Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir.

2003); *Baker v. Stevenson*, No. 12-cv-15290, 2014 WL 11309773, at *6-7 (E.D. Mich. Mar. 31,

2014), *aff'd*, 605 F. App'x 514 (6th Cir. 2015); *Carter v. Michigan Dep't of Corr.*, No. 12-cv-

12621, 2013 WL 5291567, at *4 (E.D. Mich. Sept. 19, 2013), *aff'd* (Sept. 26, 2014) ("Selecting

the appropriate medication for a patient is a classic example of a matter for medical judgment,

which may rise to medical malpractice but not deliberate indifference.") (citation and internal

quotation marks omitted); *Schweiger v. Corr. Med. Servs., Inc.*, No. 11-15345, 2012 WL 7767245,

at *6 (E.D. Mich. Aug. 15, 2012), *report and recommendation adopted*, No. 11-15345, 2013 WL

1148443 (E.D. Mich. Mar. 19, 2013).

## f.    Defendants Paquette and Merling

Plaintiff's deliberate indifference claims against Defendants Paquette and Merling relate

to the medical treatment that they provided to Plaintiff following a fall that he took on September

21, 2015, upon returning to the correctional facility after an off-site medical visit. (Docket no. 1

¶¶ 337-71.) Plaintiff explains that as he was walking through the front door of the facility, his

right hip and leg gave way and he collapsed, hitting his head on the door frame as he fell to the

floor. He asserts that he was suffering from sharp pain in his pelvis, SI joint, and lumbosacral

spine, and that he was unable to get up, so he lay on the floor writhing in pain and urinated on

himself. Defendants Merling and Paquette allegedly responded to the incident and ordered

Plaintiff to get up, and when he did not, they grabbed Plaintiff by his clothes and forced him into

a wheelchair, in total disregard of Plaintiff's pain or the fact that he had urinated on himself.

Plaintiff claims that by refusing to stabilize Plaintiff with a backboard as is required by emergency

protocol and instead forcing Plaintiff into a wheelchair, Defendants Merling and Paquette were

deliberately indifferent to the possibility of causing Plaintiff further injury or permanent paralysis.

According to Plaintiff, he was then wheeled to the healthcare clinic where he told Defendant Paquette that he could not move without severe pain. Defendant Paquette allegedly offered Plaintiff two Tylenol tablets but denied his requests for a corticosteroid injection and a cane. Plaintiff alleges that Defendant Paquette effectively denied Plaintiff emergency treatment for his collapse and thereby demonstrated deliberate indifference to Plaintiff's temporary paralysis and extreme pain.

Plaintiff's medical records indicate that Plaintiff was examined by Defendants Merling and Paquette after his collapse on September 21, 2015. Defendant Merling's examination note indicates that Plaintiff was found lying on the floor and was refusing to move or lift himself up to a sitting position. Defendant Merling saw no spasms or signs of injury and advised Plaintiff to move his legs. She further observed tenderness in his back, pain with movement, numbness but intact sensation, and no weakness or tingling. Defendant Merling observed Plaintiff to be very dramatic and uncooperative, noted that Plaintiff had urinated on himself, and opined that the objective exam findings did not collaborate his subjective complaints. Defendant Merling referred Plaintiff to medical provider Bienvenido B. Canlas, M.D. and also called Defendant Paquette to evaluate Plaintiff. (Docket no. 156 at 412-15.)

Defendant Paquette's treatment notes reflect that she initially responded to the site of Plaintiff's collapse and observed that he was able to move all extremities and had no spastic movements, vertebral tenderness, or paraspinal spasms. She noted that he had urinated on himself, that his neck flexion was normal, and that his reflexes were difficult to identify because he began to bend both knees during testing. After Plaintiff was brought to healthcare and examined by Defendant Merling, Defendant Paquette examined Plaintiff again. Defendant Paquette observed that Plaintiff was able to move all extremities, had no ankle clonus, had normal sensation, and she

found no signs of cord compression or myelopathy.  Yet, Plaintiff "screamed demanding a cortisone injection."  The treatment record indicates that Defendant Paquette offered Plaintiff Tylenol, which he refused.  Defendant Paquette then observed Plaintiff stand with ease and walk back to his unit with a slight limp, bend over almost completely to 90 degrees, and then stand up again without assistance.  Defendant Paquette concluded that Plaintiff did obviously suffer from some pain as evidenced by previous treatment notes, including radicular pain and arthritis, but she opined that Plaintiff's sudden episode of collapse because of pain with full range of motion in all of his extremities, flexion of his neck and back, and his ability to walk was unlikely.  She noted that Plaintiff was difficult to examine given his angered nature and uncooperative state.  Defendant Paquette concluded that Plaintiff was exhibiting malingering behavior at that time but advised that he could send a kite if other issues arose.  (Docket no. 156 at 420-21.)

Assuming that Plaintiff's collapse constituted a serious medical need caused by a serious medical condition, the medical records reflect that Defendants Merling and Paquette promptly responded to Plaintiff's collapse and upon further examination did not "subjectively perceive facts from which to infer a substantial risk" to Plaintiff.  "[A]n official's failure to alleviate a significant risk that *he should have perceived but did not,* while no cause for commendation, cannot . . . be condemned as the infliction of punishment."  *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 838).  With regard to Defendant Merling and Defendant Paquette's decision to transport Plaintiff to healthcare in a wheelchair instead of on a backboard, Plaintiff has not placed verifying medical evidence in the record to establish the detrimental effect of that transport.  *See Rhinehart*, 894 F.3d at 738.  Accordingly, Plaintiff cannot state a claim for deliberate indifference on these facts.

g.    Defendant Hutchinson

Finally, Plaintiff challenges the course of treatment that Defendant Hutchinson took with regard to Plaintiff's HCV as well as Defendant Hutchinson's August 2015 recommendation of Tylenol for pain management as deliberately indifferent. (*Id*. ¶¶ 428-441, 449-55.) Plaintiff was diagnosed with HCV on or about January 28, 2013. (Docket no. 156 at 95.) Plaintiff signed a Hepatitis Liver Biopsy and Treatment Contract on May 3, 2013. A request for a liver biopsy was subsequently put on hold pending the results of an HCV FibroSURE test. (*Id*. at 111, 113.) On May 24, 2013, Defendant Hutchinson reviewed those results and determined that the FibroSURE test and application of the SAFE biopsy algorithm established fibrosis >/= 2 and absence of cirrhosis without needing a liver biopsy. (*Id*. at 125.)

Defendant Hutchinson conducted a telemedicine conference with Plaintiff on September 10, 2013, to evaluate Plaintiff's candidacy for HCV treatment under the MDOC July 1, 2008 protocol. In his assessment, Defendant Hutchinson reiterated that Plaintiff had F2-3 fibrosis under the FibroSURE test but noted that Plaintiff also had macrocytosis and a flipped AST over ALJ, which he stated made him a little uncomfortable given the length of time that Plaintiff may have been infected. Therefore, Defendant Hutchinson ordered an alpha fetoprotein, CBC, and comprehensive panel and stated that he would review the results of those tests and advise if a liver biopsy was needed. He stated that he and Plaintiff would follow up in four months via telemedicine and urged Plaintiff not to overuse acetaminophen in the meantime. He also informed Plaintiff of the 50/50 cure rate with the then-available treatment options and opined that Plaintiff would be better served by awaiting improved treatment options unless his fibrosis progressed to F4. (*Id*. at 132-36.)

Defendant Millette evaluated Plaintiff with regard to his HCV on June 18, 2014 and noted that Plaintiff's ALT was elevated but that he was negative for jaundice, pruritis, edema, asthma, diarrhea, palpitations, psychiatric symptoms, rash, or thyroid disease.  At that appointment, Plaintiff inquired about the status of his liver biopsy approval.  Defendant Millette contacted Defendant Hutchinson, who determined that Plaintiff did not need a biopsy at that time and that Plaintiff would be monitored by his labs.  (*Id*. at 258, 266.)

Plaintiff had a telemedicine consultation with Dr. Hutchinson on August 11, 2015.  In the accompanying consultation note, Dr. Hutchinson recited a bit of Plaintiff's treatment history, stating that his initial visit with Plaintiff was on September 10, 2013, after which he had some suspicion that Plaintiff's fibrosis may have moved into early stage IV, which was confirmed with further evaluation of AFP.  Defendant Hutchinson explained that HCC surveillance was therefore initiated, and the most recent liver ultrasound showed no liver mass.  Defendant Hutchinson assessed that Plaintiff had early well-compensated cirrhosis, which made Plaintiff a candidate for the Michigan DOCs 20-slot DAA program, in which slots were filled in order of the severity of the liver disease.  Defendant Hutchinson opined that Plaintiff would probably not be a top priority for another six months.  Defendant Hutchinson therefore referred Plaintiff for liver ultrasounds as HCC surveillance every six months.  He again warned Plaintiff not to overuse acetaminophen, among other things, and stated that he would see Plaintiff in six months unless circumstances warranted an earlier visit.  (*Id*. at 391-94.)

On August 25, 2015, Plaintiff had an appointment with Defendant Paquette, at which Defendant Paquette informed Plaintiff that Defendant Hutchinson recommended Tylenol, not NSAIDs, as an over-the-counter pain medication for HCV patients if needed.  Defendant Paquette further informed that Defendant Hutchinson had not written a prescription for Tylenol for Plaintiff,

so Plaintiff could purchase it from the store.  (*Id*. at 401-02.)  Plaintiff had another ultrasound of his liver on September 21, 2015, the results of which stated that Plaintiff's liver was "unremarkable."  (*Id*. at 422.)  On January 27, 2016 and February 17, 2016, Dr. Hutchinson ordered blood work for Plaintiff, and on February 22, 2016, an ultrasound of Plaintiff's liver revealed no solid or cystic lesions.  (*Id*. at 468, 487, 490.)

Plaintiff began Harvoni treatment for his HCV on March 1, 2016, as prescribed by Defendant Hutchinson.  (*Id*. at 493.)  Plaintiff's Harvoni treatment lasted for eighty-four days, until May 23, 2016.  (*Id.*)  Plaintiff subsequently had three more blood draws on June 20, 2016, August 15, 2016, and November 7, 2016, as ordered by Defendant Hutchinson, and a liver ultrasound on August 10, 2016.  (*Id*. at 511, 561, 571.)  On December 6, 2016, Defendant Hutchinson informed Plaintiff that the HCV had been cleared from his body but explained that Plaintiff still had cirrhosis of the liver for which he would need to have an ultrasound as HCC surveillance every six months indefinitely.  In light of Plaintiff's cirrhosis, Defendant Hutchinson also recommended that Plaintiff take acetaminophen for pain instead of ibuprofen, stating that a dose of acetaminophen at 650 mg three times daily was safe.  (*Id*. at 618-19.)

In the claims that Plaintiff exhausted against Defendant Hutchinson, he disputes the facts surrounding the August 11, 2015 teleconference.  Plaintiff asserts that Defendant Hutchinson assured him that he would be ordering a liver biopsy and that "adequate pain management" would be forthcoming.  When Plaintiff found out a couple weeks later that Defendant Hutchinson recommended only Tylenol for pain, he filed Grievance 3048 against Defendant Hutchinson for "his continued denial of adequate pain management."  The next month, on September 21, 2015, Plaintiff was taken to an offsite hospital for what he expected to be a liver biopsy, but to "his dismay," he had an ultrasound instead.  Plaintiff alleges that Defendant Hutchinson's

characterization of Plaintiff's cirrhosis as non-urgent allowed him to continue HCC surveillance, *i.e.* "passive monitoring," with ultrasounds instead of performing a liver biopsy, the latter of which Plaintiff claims was "essential for determining the extent of Plaintiff's cirrhotic scarring." Plaintiff alleges that he wrote two letters to Defendant Hutchinson complaining of the course of treatment, inadequate and hepatoxic pain management, and the lack of palliative care, to which he received no response. Plaintiff then filed and exhausted Grievance 0077 regarding the same. (Docket no. 1 ¶¶ 428-441, 449-55; docket no. 125-3 at 30, 52.)

The Corizon Defendants argue that Plaintiff's disagreement regarding the HCV treatment he received is insufficient to avoid summary judgment. (Docket no. 155 at 41-42.) To support their argument, Defendants rely on *Crawford v. Washington*, No. 4:17-cv-11423, 2018 WL 3543600 (E.D. Mich. June 11, 2018), *report and recommendation adopted*, No. 17-11423, 2018 WL 3536608 (E.D. Mich. July 23, 2018). The plaintiff in *Crawford* was informed of his HCV diagnosis in 2010, placed on a regimen of monitoring for signs of liver disease progression, and prescribed Harvoni treatment in mid-2016, which ultimately cured his HCV. The court held that the plaintiff's claims against Dr. Hutchinson regarding the timing and course of his treatment could not survive summary judgment because they sounded in medical malpractice, not deliberate indifference. *Crawford*, 2018 WL 3543600, at *5 (quoting *Westlake*, 537 F.2d at 860 n.5). Defendants argue that Plaintiff's claims here are similarly deficient because, like the plaintiff in *Crawford*, Plaintiff "was monitored until he was one of the highest priority prisoners for treatment—at which time his medical need became sufficiently serious to require treatment—and at which time it is undisputed that he received Harvoni treatment, which cured his HCV infection." (Docket no. 155 at 41-42 (quoting *Crawford*, 2018 WL 3543600, at *7).) Defendants are correct. *See also Warman v. Marberry*, No. 05-10138, 2008 WL 2745170, at *9 (E.D. Mich. July 14, 2008)

(Where plaintiff admittedly received some treatment for his HCV but did not receive the treatment he requested because a doctor determined that his condition was not severe enough, the plaintiff's challenge involved a question of medical judgment, a matter not properly addressed by a deliberate indifference claim.).

Here, Plaintiff disagrees with Defendant Hutchinson's medical judgment regarding the course of treatment and the safety and adequacy of Tylenol to treat Plaintiff's pain.  It is well settled that "[a] disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth Amendment."  *Rhinehart*, 894 F.3d at 744.  Moreover, Plaintiff has not submitted medical proof (either in the form of expert medical testimony or otherwise) that the treatment he received from Defendant Hutchinson for his HCV was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*. at 737-38.  Under *Rhinehart*, *Crawford*, and *Warman*, Plaintiff's claims against Defendant Hutchinson fail as a matter of law.

Each of Plaintiff's deliberate indifference claims contain the same general fact pattern – that Plaintiff did not receive the type of medical treatment that he requested, preferred, or believed was necessary, when he wanted it.  Because differences in judgment between an inmate and prison medical personnel regarding the appropriate treatment are not enough to state a deliberate indifference claim, Defendants' Motions for Summary Judgment should be granted in this regard.

### 5.   *Plaintiff's Conspiracy Claim*

Plaintiff alleges that "Defendants BHCS-PMC and Corizon, Through Its Providers [Hutchinson, Buller, Grahn, Millette, Paquette, Johnston, and Kerstein], Conspired With Indifference to Inflict Pain and Suffering on Plaintiff Through the Denial of Adequate Pain Management and Proper Diagnostic Tests, Resulting in Plaintiff's Permanent Disability and Partial

Paralysis, to Inflict Plaintiff With Liver Toxicity Leading to Hepatitis and Cirrhosis Where the Defendants Limited Plaintiff to Only Off-Label, Hepatotoxic Medications for Pain, and to Hasten Plaintiff's Ultimate Death by Stage IV Cirrhosis Which Defendant Hutchinson Allowed to Develop Without a Biopsy or Preventative Treatment." (Docket no. 1 at 109-10; docket no. 1-1 at 1-22.)  Plaintiff alleges that the alleged conspiracy began in June 2009 when Plaintiff complained about Defendant PMC's changes to his pain management regimen and rescission of recommendations for neurosurgical consults. (Docket no. 1 ¶¶ 587, 590.)  He claims that as a direct result of his complaints, Defendants PMC and Corizon conspired to retaliate against him by providing grossly inadequate pain management and treatment. (Docket no. 1-1 ¶ 602.)  According to Plaintiff, as the individual defendants named in this claim became Plaintiff's treatment providers, they joined in the conspiracy to deny Plaintiff adequate and/or proper treatment.

Plaintiff must prove an actual violation of 42 U.S.C. § 1983, however, to succeed on his conspiracy claim. *Dunn v. Sch. Dist. of the City of Detroit*, No. 07-11950, 2008 WL 4279363, at *5 (E.D. Mich. Sept. 16, 2008) (citing *Scott v. Stone*, 254 F. App'x 469, 474-75 (6th Cir. 2007) (citing *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1st Cir. 2003) ("To demonstrate conspiracy under § 1983, plaintiff must show an actual abridgement of some federally-secured right."); *Vaden v. Village of Maywood, Ill.*, 809 F.2d 361, 366 (7th Cir. 1987) (It is essential that the conspiratorial conduct in fact resulted in a violation of plaintiff's constitutional rights.)))  As discussed above, Plaintiff has failed to prove that any of his remaining claims regarding his medical treatment for which he exhausted his administrative remedies rose to the level of a constitutional violation under the Eighth Amendment.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

### D.      Conclusion

For the reasons stated herein, the Corizon Defendants' Motion for Summary Judgment (docket no. 155) should be **GRANTED IN PART** and **DENIED IN PART**, the MDOC Defendants' Motion for Summary Judgment (docket no. 185) should be **GRANTED**, and this matter should be dismissed in its entirety.

## III.    NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Eastern District of Michigan Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  July 19, 2019          s/ Mona K. Majzoub
                               MONA K. MAJZOUB
                               UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Plaintiff and counsel of record on this date.

Dated:  July 19, 2019          s/Eddrey Butts
                               Case Manager